[No. 10035.  *En Banc.*  March 20, 1912.]

THE STATE OF WASHINGTON, *on the Relation of Golden Valley Irrigation Company, Plaintiff*, v. THE SUPERIOR COURT FOR YAKIMA COUNTY, *Respondent*.[1]

STATUTES—TITLE AND SUBJECTS—AMENDATORY ACTS.  The title "an act to amend an act approved November 13, 1873, entitled an act to provide for the formation of corporations" is sufficient and broad enough to include a provision conferring the right of eminent domain on corporations organized for certain purposes.

EMINENT DOMAIN—PUBLIC USE—IRRIGATION.  The use of waters for irrigation is a public use, under Const., art. 21, § 1, providing that "the use of the waters of this state for irrigation . . . shall be deemed a public use."

EMINENT DOMAIN—IRRIGATION—"CORPORATE PURPOSES" — RESERVOIRS.  Under Rem. & Bal. Code, § 9510, providing that corporations organized for the purpose of erecting and maintaining flumes or aqueducts to convey water for . . . irrigation . . . shall have the same right to appropriate lands for necessary corporate purposes as other corporations and to take any water not otherwise legally appropriated, an irrigation company may condemn land for a reservoir site, that being a "necessary corporate purpose" within the act, where it is necessary to store water in order to accomplish irrigation (PARKER, CHADWICK, and FULLERTON, JJ., dissenting).

Certiorari to review a judgment of the superior court for Yakima county, Preble, J., entered November 9, 1911, dismissing a condemnation proceeding, upon sustaining a demurrer to the petition.  Reversed.

[1]Reported in 122 Pac. 19.

*Parker & Richards* (*Milo A. Root*, of counsel), for relator.

*Holden & Shumate, H. A. La Berge*, and *H. J. Snively*, for respondent.

MOUNT, J.—The question presented in this case is, whether a corporation organized for the purpose of irrigation has the right to take land by condemnation for a storage reservoir site. The lower court held that the relator had no such right under the statute, and for that reason sustained a demurrer to the relator's petition, and dismissed the proceeding to condemn land for that purpose. The relator thereupon sued out this writ of review.

The relator rests its right to condemn land for a reservoir site upon the law found in the territorial session Laws of 1879, page 134, as follows:

"An act to amend an act approved November 13, 1873, entitled an act to provide for the formation of corporations.

"Section 1. Be it enacted by the legislative assembly of the territory of Washington: That all corporations, authorized to do business in the territory, and who have been, or may hereafter be, organized, for the purpose of erecting and maintaining flumes or aqueducts to convey water for consumption or for mining, irrigation, milling or other industrial purposes, shall have the same right to appropriate lands for necessary corporate purposes, and under the same regulations and instructions as are provided for other corporations in the act to which this is amendatory, and such corporations organized for such purposes, in order to carry out the object of their incorporation, are authorized to take and use any water not otherwise legally appropriated or legally claimed.

"Sec. 2. This act shall take effect and be in force from and after its passage.

"Approved November 14, 1879."

This law was reenacted in the Code of 1881, § 2472, omitting the words, "in the act to which this is amendatory," and has been carried forward into the subsequent codes. Rem. & Bal. Code, § 9510. This law has never been specifically repealed or amended, and we think has not necessarily been

repealed by implication. The validity of this statute is questioned by respondent, upon the ground that the title of the act is insufficient. That question was settled in *Prescott Irr. Co. v. Flathers*, 20 Wash. 454, 55 Pac. 635. When the state constitution was later adopted, a section was inserted providing: "The use of the waters of this state for irrigation, mining, and manufacturing purposes shall be deemed a public use." Art. 21, § 1. There can be no doubt, therefore, that the use of water for irrigation is a public use.

It is argued by the respondent that, because the statute quoted above provides that corporations organized for the purpose of erecting and maintaining flumes or aqueducts to convey water shall have the right to appropriate lands for necessary corporate purposes, the words "necessary corporate purposes" refer to the purposes named in the act, viz., "erecting and maintaining flumes or aqueducts to convey water;" that the act should be strictly construed, and inasmuch as it does not mention reservoirs, the mere fact that the corporation was organized for the purpose of constructing and maintaining reservoirs, flumes, aqueducts and ditches for irrigation, does not give the corporation the right to condemn land for other purposes than flumes and aqueducts to convey water.

If this construction must be given to the act, it follows that the relator may acquire by condemnation such lands only as are necessary for a flume or an aqueduct to convey water, and that no land can be so acquired for the purposes of a reservoir site or for the storage or conservation of water. The object of this statute was to provide for irrigation and the other purposes named. The object of a corporation formed for irrigation is not merely to erect and maintain flumes or aqueducts. These are mere necessary incidents to the main object or purpose. The object is to irrigate lands and to use water for that purpose. Flumes or aqueducts are of no use without water. Irrigation cannot be consummated without water. Water cannot be success-

fully carried from one place to another without aqueducts. The application of water to the soil constitutes irrigation. Without water, irrigation fails. The acquisition of water is therefore necessary. If water can be obtained from streams or natural lakes at proper times and in sufficient quantities, a storage reservoir would not be necessary; but when it is necessary to store water in order to accomplish irrigation or to use the flumes or aqueducts, a reservoir is a necessary corporate purpose. When we consider the purposes of the act, it seems apparent that, when the legislature said corporations organized for the purpose of erecting flumes or aqueducts to convey water *for irrigation,* it was meant thereby to include corporations organized for irrigation; and when the legislature said such corporations shall have the same right to appropriate lands for necessary corporate purposes as other corporations, and, in order to carry out the objects of their incorporation, are authorized to take and use any water not otherwise legally appropriated, it was meant that such corporations might take and hold water for the purposes named. The only way this can be done in this case is by storage. A storage reservoir is therefore a necessary corporate purpose. To construe the act otherwise, would be to say that a corporation organized to construct flumes or aqueducts for irrigation is limited to the right to condemn land for a flume or aqueduct only, with no power to provide water for such flumes or aqueducts unless it may be done from continuous flowing streams or lakes. This construction places a restricted meaning upon the words "for necessary corporate purposes." If these words were meant to restrict the right to appropriate water to the purposes of a flume or aqueduct, we think the restrictive phrase "for such purposes" would have been used instead of the general phrase "for necessary corporate purposes." These words are general. They were intended to enlarge the right to appropriate lands rather than to restrict such right.

Much is said in the briefs and in the oral argument about

the use of the word "reservoir," in other statutes and consti-
tutions adopted about the time our constitution was adopted.
While it may be true that a flume or aqueduct is not neces-
sarily a reservoir, as that word is commonly used and under-
stood, we deem it unnecessary to enter into a discussion of the
meaning of these terms, because we are of the opinion that
the statute meant to give to irrigation companies the right
to take lands for necessary corporate purposes without lim-
itation other than necessity; and when it appears that a res-
ervoir is necessary for the convenient and appropriate use
of water for irrigation, such corporation has the right to
take land for that purpose by condemnation.   In short, the
general phrase "for necessary corporate purposes" includes
all the essential means, and it was therefore not necessary to
specify all of the particular means for irrigation.

The judgment is therefore reversed, with directions to the
lower court to proceed in harmony with the views herein ex-
pressed.

DUNBAR, C. J., CROW, ELLIS, MORRIS, and GOSE, JJ., con-
cur.

PARKER, J. (dissenting)—I am not able to concur in the
foregoing opinion of the majority, and am moved to state
my dissenting views as follows:   Viewed superficially, this
grant of eminent domain power "to appropriate land for
necessary corporate purposes," may seem very broad and
comprehensive.   I think it is manifest, however, that the
scope of the power thus granted must be limited by the gen-
eral powers of the corporations to which it is granted, as
those general powers are defined by this law.   It is incon-
ceivable that a corporation can have the right to acquire
property by condemnation for purposes not within its gen-
eral powers, however broad and comprehensive the language
of the grant of the eminent domain power may be.   The lan-
guage of the first part of the law leaves no uncertainty upon
that subject, for it tells us that "corporations . . . or-

ganized for the purpose of erecting and maintaining flumes
or aqueducts to convey water for irrigation . . ." are the
corporations to which this right of eminent domain is granted.
Looking to the language of this law alone, it seems to me
there is no escape from the conclusion of the learned trial
court that the purposes therein specified for which the cor-
porations mentioned are organized, to wit, for maintaining
flumes and aqueducts, fix the limit of the right of eminent do-
main thereby granted to such corporations, and that the ac-
quiring of reservoir sites by condemnation is not included
therein. Clearly the words "flumes or aqueducts" do not in-
clude "reservoirs" of the nature for which land is here sought
to be acquired, especially in view of the language of the law
which mentions flumes or aqueducts to "convey water." I
think that this language gives nothing more than the right to
acquire by condemnation, rights of way for "flumes or aque-
ducts."

It appears by the allegations of the relator's petition for
condemnation that its corporate powers, as defined by its ar-
ticles of incorporation, include the power to maintain reser-
voirs for the purpose of impounding water. This no doubt
is a proper power to be exercised by the relator; and there
seems to be no legal objection to its including such power
among its other general corporate powers. Under such power
it, of course, can acquire by purchase reservoir sites. But
the relator cannot extend its right of eminent domain be-
yond that granted by this law merely by including corporate
powers in its articles of incorporation in excess of the cor-
porate powers specifically mentioned in this law for the very
purpose of describing the corporations to which the right of
eminent domain is given. When this law gave the right of
eminent domain "*to appropriate land for necessary corpo-
rate purposes*" to corporations organized for "*maintaining
flumes or aqueducts to convey water,*" it gave the right to
so acquire land for the maintenance of flumes or aqueducts and
nothing more, just as if it had named these two purposes in

the grant, instead of using the words "for necessary cor-
porate purposes." Because those are the only corporate
purposes recognized in the corporations mentioned, so far
as their right of eminent domain is measured by this law.
Whatever general powers in addition to these the relator may
have by virtue of its articles of incorporation are of no con-
sequence, so far as its right of eminent domain is concerned
under this law.

If we turn to the act of 1873 which this law purports to
amend, Laws of 1873, pp. 411, 417, we find nothing there sug-
gesting an extension of this right of eminent domain beyond
appropriating land for "flumes or aqueducts." It seems that
the language of this law giving the right of eminent domain
"under the same regulations and instructions as are provided
for other corporations in the act to which this is amendatory,"
only relates to the condemnation procedure provided by the
law of 1873. But even if we consider the right of eminent
domain granted by the law of 1873 to other corporations, we
find that such right is not there granted in general language
for corporate purposes, but the several purposes for which
private property may be so acquired are specifically enumer-
ated therein, and neither reservoirs nor reservoir sites are
among them.

Our attention is directed to some decisions of this court
by counsel for relator which it is insisted support their con-
tention that this grant of right of eminent domain is suf-
ficiently broad to include reservoir sites. Our attention is
first directed to *State ex rel. Attorney General v. Superior
Court*, 36 Wash. 381, 78 Pac. 1011, in which case it was
sought to condemn state school lands for the purpose of
"procuring water for household and domestic purposes and
also for a reservoir site." The right to condemn was ap-
parently rested upon the law of 1879 above quoted, and was
denied by the court in that case upon the sole ground that
school land was not subject to condemnation under that law,
the court observing that "condemnation statutes, overriding

as they do, the high right of private property, and being in derogation of common right must be strictly construed," citing numerous authorities in support of this rule.   In the course of the decision, however, referring to this law, the court said: "That section appears to confer power to appropriate lands for such corporate purposes as are sought to be accomplished here." I hardly think this is an expression of positive opinion as to the right to condemn land for a reservoir site under this law; but if it be regarded as such, it in any event was only *dictum* and was wholly unnecessary to a decision of the case, and would seem to be somewhat out of harmony with the rule of strict construction above quoted upon which the court there rested its decision.

The other decisions relied upon and called to our attention by counsel for relator, are *State ex rel. Harlan v. Centralia-Chehalis Elec. R. & P. Co.*, 42 Wash. 632, 85 Pac. 344, 7 L. R. A. (N. S.) 198, and *State ex rel. Harris v. Olympia Light & Power Co.*, 46 Wash. 511, 90 Pac. 656.   While it is true that the disposition of these cases resulted in the acquiring of land by eminent domain proceedings for storing water, the right of the power companies to so acquire the land for that purpose was not challenged.   Their right to condemn was challenged upon other grounds.   So those cases do not aid us in the problem here for solution.   In view of the statutory provisions under which those power companies were seeking to exercise the right of eminent domain, it could well be argued that their power to acquire reservoir sites by condemnation was granted by the statutes under which they were proceeding.   We are not called upon, however, to express any opinion upon that question.   It is enough to say that they were not proceeding under this law nor was their right of eminent domain challenged upon the ground here presented.

It is insisted that the construction given this law by the learned trial court is not in keeping with the "broad views" expressed by this court in *State ex rel. Galbraith v. Superior*

*Court*, 59 Wash. 621, 110 Pac. 429, 140 Am. St. 893, and of the United States supreme court in *Fallbrook Irr. Dist. v. Bradley*, 164 U. S. 112, and *Clark v. Nash*, 198 U. S. 361. Those decisions dealt mainly with the power of the state to exercise and grant the right of eminent domain in promoting irrigation.   It is only in measuring the sovereign power of the state that it can be said any such broad or liberal views were expressed in those decisions.   When it comes to a determination of the extent of the grant of eminent domain power by the state to persons and corporations, I see nothing in those decisions which would call for any departure from the rule of strict construction indicated by the language above quoted from *State ex rel. Attorney General v. Superior Court.*   It may be that a wise legislative policy would call for the granting of the right of eminent domain to public service irrigation corporations, enabling them to acquire reservoir sites such as the relator is here seeking to do, but that view, however sound as a matter of policy, would furnish no reason for our reading into the law something which we do not find there.   I think the judgment should be affirmed.

CHADWICK, J. (dissenting)—I think Judge Parker has clearly shown that the act relied on to sustain the majority opinion will not bear the construction put upon it.   I will not discuss that feature of the case, but refer to two propositions, one of law and the other of fact or policy as it may be, either of which in my judgment should restrain the court from pronouncing its present judgment to be the law of the land.

It is a settled principle that, if an act granting the power of eminent domain be doubtful, its terms will not be extended or enlarged by construction.

"The right to take private property in any form, without the consent of the owner, is a high prerogative of sovereignty, which no individual or corporation can exercise without an express grant.   The power may be delegated, but the delegation must plainly appear.   It is accordingly held that

statutes providing for such a taking under the exercise of the power of eminent domain must be strictly construed. It is a taking in derogation of private rights.   It is in hostility to the ordinary control of the citizen over his estate, and statutes authorizing condemnation are not to be extended by inference or implication."    2 Lewis' Sutherland Statutory Construction (2d ed.), § 559.

The law does not mean doubt in the mind of one judge or a majority of the court, for we know that they have no doubt; otherwise they would not have pronounced the decision.   But, as employed in the canon just referred to, doubt means, to use the language we have so often employed in negligence cases, that the minds of reasonable men differ upon the proposition advanced.   Here we have a statute passed forty years ago, and at a time when the problem of irrigation had not developed to such an extent as to demand storage of flood waters.   Men led water out of flowing streams and onto their own lands.   The irrigation company as we now know it and the storage of flood waters was, as we may assume, never considered by the legislature, for it clearly legislated for existing conditions and not for that which was not foreseen.   The old act has stood unimpaired and unamended during all these years, and we may take it as a positive postulate that the legislature never intended to put the sovereign power of the state to control an agency as destructive as dynamite into irresponsible hands.   At the same session, and on the same day, an act was passed granting to manufacturing and mining companies the right to make reservoirs.   It was left out of the irrigation act, and as I believe purposely, for the mill dam of a generation ago is as nothing compared with the reservoir for impounding the flood waters of the winter season as they are at present constructed.   The one rarely raised the waters above the banks of the stream.   The other spreads it over vast areas.   The capacity of the one can be measured in thousands of gallons.   The other is measured in millions.   As a matter of good sound public policy, this court should not grant by construction a power

which should never be granted, even by legislatures, without safeguarding in every possible way the rights of the public. The danger of our decision lies in this, that although we grant the power, we can put no restraint upon it. The law is left by this decision in this way: The irrigation company can condemn without let or hindrance and build without restraint or supervision, to the possible peril of life and property below the dam. The building of such reservoirs, because of the great attendant danger, should never be allowed or entertained until the legislature has fixed the method and manner of construction or reserved the right of supervision. The court being divided, we should wait the few months which will intervene, when the matter can be settled by the legislature in such way as it sees fit.

In an article of singular worth, published in the Technical World Magazine for January, 1912, it is shown that, since 1890, 35 solid masonry dams, 41 earth dams, four rock-filled dams, and one steel dam, have gone out from one cause or another; and while the damage is not aggregated, it is said that the damage at the Johnstown flood was $10,000,000, and at the Austin flood, $6,000,000 in money. The floods mentioned cost the lives of more than 2,000 people. The writer says:

"The twenty years between Johnstown and Austin are dotted thick with similar warnings, men, women and children swept away and drowned, property wiped out of existence. At least eighty-one dams of considerable size burst, unleashing ruin, during those twenty years. . . . In only four or five states—Rhode Island, Massachusetts, Connecticut and Colorado—has there been even a pretense of protecting people and property against the danger of dams, improperly built or maintained. Almost everywhere greedy or ignorant private interests have been permitted—free from the inspection of state engineers—to pen back great floods behind dams which were certain, sooner or later, to break and let ruin loose upon the countryside. And the excuse has always been that nothing must be done to interfere with the growth of business. But whatever the menace of the dam

in the past, the time has now come when to delay longer the passage and enforcement of strict and scientific inspection laws will be worse than criminal carelessness. . . . But few structures built by man are so certain as are dams to be subject to abnormal tests by the almost resistless forces of nature. Yearly it is probable that great floods will sweep down the water-sheds and perhaps double the pressure behind the dams which block their way. If the dam holds, the flood water may force its way round the ends of the masonry and sweep away the earth and rubble wings. That is what happened in Wisconsin at the two dams on the Black river, with the result that the frightened people of Black River Falls looked down a few hours later on a swirling river covering the land where had stood their banks and business houses. Imminent death and destruction for thousands of people are penned behind the walls of a thousand dams in the United States alone. Even when—as at Austin—warning is given that the wall is too weak, corporation managers—their own lives not in danger—are too often willing to take a chance with the lives and property of other people."

For these reasons, then—one, that our minds differ as to the construction of the act, and the other that sound public policy demands that the questions here discussed be settled by the legislative branch of the government—I am impelled to dissent from the views of the majority.

FULLERTON, J. (dissenting)—For the reasons stated by Judges Parker and Chadwick, I dissent from the conclusions of the majority.